<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **DONNA RANIERI AND NICHOLAS RANIERI**, on behalf of themselves and all others similarly situated,<br><br>*Plaintiffs*,<br><br>v.<br><br>**BANCO SANTANDER, S.A., et al.**,<br><br>*Defendants*. | Civil Action No. 15-3740<br><br>OPINION |

**ARLEO,** United States District Judge

**THIS MATTER** comes before the Court on Defendants Banco Santander, S.A., Santander Holdings USA, Inc., Santander Bank, N.A., Sovereign Bancorp, Inc., and Sovereign Bank, N.A.'s (collectively, "Santander") renewed motion to compel individualized arbitration. Dkt. No. 46. In this putative collective action, Plaintiffs Donna and Nicholas Ranieri (collectively, "Plaintiffs") claim that Santander failed to pay them overtime in 2012 and 2013 as required by federal and state law. Santander assert the claims must be arbitrated because of an arbitration clause in Plaintiffs' signed employment contract. Because the terms of the contract are clear and Plaintiffs manifested objective intent to be bound to it, the motion is **GRANTED**.

I. **BACKGROUND**

    A. Operative Agreements

Santander operates retail banks in several states, including New Jersey and Pennsylvania. Compl. ¶¶ 9-13, 24, 34, Dkt. No. 1. From 2012 to 2013, Donna Ranieri and her son, Nicholas Ranieri, worked as mortgage development officers in Santander's New Jersey bank branches.

1

Griffin Decl. Ex. A, Deposition of Donna Ranieri ("Donna Dep.") 23:15-18, Dkt. No. 46-3; Id. Ex B, Deposition of Nicholas Ranieri ("Nicholas Dep.") 9:10-11.  Mortgage development officers are responsible for originating residential mortgage loans for Santander's customers.  Compl. ¶¶ 81, 90.

Donna and Nicholas began working for Santander (then operating as Sovereign Bank) in July and December 2012, respectively.  Cohen Decl. ¶¶ 2, 4, Dkt. No. 8-2.  This was Nicholas's first time working for the bank, but it was Donna's second—she worked there previously from 2000 to 2008.

Prior to their start dates, Santander gave them three-page written offers of employment ("Offer Letter").  The first page of the Offer Letter contains the bolded word "**Agreement**," followed by a clause stating, "[a]s a condition of employment, you will be required to execute the enclosed Mortgage Retail Development Officer Agreement ("Agreement"), with all attached Exhibits, on or before your first day of work.  Also attached you will find a copy of the Mortgage Sales Commission Plan ("Plan") which reflects your pay structure."  Griffin Decl. Exs. C and D, Offer Letters, Dkt. No. 46-5 and 46-6.  Donna and Nicholas both signed their Offer Letters on the signature line directly below the sentence, "Offer accepted as outlined above."  Offer Letter at 3.  Donna signed her Offer Letter on July 17th; Nicholas signed his on December 19th.

They also received and signed the Mortgage Development Officer Agreements ("MDO Agreement"), the documents containing the arbitration clause at issue.  The MDO Agreement's preamble states, "This Mortgage Development Officer Agreement ("Agreement") . . . is made by and between [Santander] ("Bank") and [Plaintiffs] ("MDO").  For good and valuable consideration and intending to be legally bound hereby, the Bank and the MDO agree as follows . . . ."  MDO Agreement at 1.  It then lists six sections that describe the parties' various obligations.  Id. at 1-5.

2

Section 5 begins with the bolded heading "**TERMINATION AND CLAIMS**." Section 5.04, on the same page, provides that "[a]ny controversy or claim arising out of the MDO's employment or the termination thereof shall be resolved through final and binding arbitration . . . ." MDO Agreement § 5.04. It continues:

> **Notwithstanding any contrary rule or procedure, the MDO agrees to waive any right to bring, maintain, or participate in, or recover any relief from, a class, collective, or representative action against the Bank, its affiliates, or any of their respective employees or other agents to the maximum extent permitted by law** . . . Such controversies and claims subject to arbitration include, but are not limited to, those arising under this Agreement and those arising under any federal, state or local statute relating to employment and any tort, contract or common law claim . . . . This provision is not intended to limit the Bank's customary rights of management, but only to provide the exclusive means by which disputes between the parties, as described herein, are to be resolved.

Id. (original emphasis).

Section 6.03 on the following page states that the Agreement "contains all of the covenants and agreements between the parties with respect to such employment in any manner whatsoever and each party acknowledges receipt of a true, fully signed copy hereof." Id. § 6.03. On the bottom of that page, Donna and Nicholas signed on the signature lines, followed by the signatures of Santander's representatives. See id. at 5. Directly above their signatures, however, is the following sentence: "**I certify, by my signature below, that I have received a copy of the Mortgage Sales Commission Plan, which has been provided to me.**" Id. (original emphasis).

Donna and Nicholas also signed a confidentiality and non-disclosure agreement, which was attached to the Agreement as Exhibit A. See id. Ex A.

The day after Donna signed the Offer Letter and MDO Agreement, Santander sent her a one-page addendum. It began, "You recently have been presented with the [MDO Agreement] and the [Commission Plan] that will apply to your employment with Sovereign Bank, beginning

3

July 30, 2012. Please accept this letter as an addendum to the terms outlined in the Commission Plan. Please note that the Agreement and Commission Plan are only be [sic] modified as outlined below. All other terms of the Agreement and Commission Plan remain in full force and effect. If you wish to accept the additional terms as outlined below, please sign and return this letter at the same time that you return your executed Agreement." Griffin Decl. Ex G, Addendum at 1, Dkt. No. 46-9. The terms of the addendum followed after. Donna signed the document directly below the sentence "[o]ffer accepted as outlined above." Id. at 2. At her deposition, she did not recall reading the opening paragraph, but she did read the next section discussing compensation. Donna Dep. 78:9-79:25

After signing the Offer Letters, the MDA Agreements, and (in Donna's case) the addendum, Donna and Nicholas started their employment with Santander.

### B. Motion to Compel Arbitration and Limited Discovery

On June 3, 2015, Plaintiffs filed a putative class and collective action complaint alleging claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 et seq., and the New Jersey Wage and Hour Law ("NJWHL"), N.J.S.A. §§ 34:11-56a et seq. Dkt. No. 1.

In August 2015, Santander moved to compel arbitration based on the arbitration clause in Plaintiffs' MDO Agreements. Dkt. No. 8. Santander argued that arbitration was required because Plaintiffs signed the agreements. The Court rejected that argument as premature in light of Plaintiffs' contention that an ambiguity existed. Plaintiffs contended, based on the bold certification in the MDO Agreement, that their signature acknowledged receipt of the Commission Plan only, and did not bind them to any other clauses in the contract. The Court ordered limited discovery, as per the Third Circuit's instructions in Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 776 (3d Cir. 2013), to determine whether Plaintiffs' purported ambiguity was

4

reasonable.  See also Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc., 247 F.3d 79, 94 (3d Cir. 2001) ("Pennsylvania law both requires that the court interpret the language without using extrinsic evidence, and allows the court to bring in extrinsic evidence to prove latent ambiguity.").

As part of limited discovery on the issue of arbitrability in this case, Santander deposed Donna and Nicholas about their reasons for signing the MDO Agreement and Offer Letter.  The crux of their testimony is that they did not intend to be bound to the terms of the arbitration clause because they did not read the Offer Letter or MDO Agreements in full.  Specifically, Donna testified that she did not read any part of the MDO Agreement except for the bolded provision certifying receipt of the Mortgage Sales Commission Plan.  Donna Dep. 74:10-75:3.  She maintains that she signed the MDO Agreement to acknowledge receipt of the Plan, she did not intend her signature to bind her to any other clauses in the document, and she would not have agreed to arbitrate had she known the clause was there.  Id. 45:2-11, 73:22-74:3, 75:9-18.  She further testified that, although she did not read the attached confidentiality and non-disclosure agreement either, she signed that too.  Id. 76:7-19.  As to the Offer Letter, Donna testified that she did not agree with the clause requiring her to execute the MDO Agreement as a condition of her employment.  Id. 69:25-70:2, 71:7-10.  However, she did not tell anyone about her disagreement with this particular clause, and she otherwise agreed to all other clauses in the Offer Letter.  Id. 71:1-14.

Nicholas' testimony was virtually identical.  He testified that the MDO Agreement's bold certification was the only part of the document he read before signing it.  Nicholas Dep. 27:13-28:9, 33:23-34:5.  He stated that he had "no interest" in reading any other portion of the document. Id. 30:6-11.  He also did not read the confidentiality and non-disclosure agreement before signing it.  Id. 32:8-11, see also 27:18-20.  He further testified that he did not recall reading the Offer Letter

at all, though he acknowledged signing it. Id. 21:6-10. Like Donna, he testified that he agreed to every other clause in the Offer Letter except for the one discussing execution of MDO Agreement (and one clause that incorrectly listed the branch's address), but he too kept that to himself. Id. 25:18-26:9.

After discovery, Santander filed the instant renewed motion to compel arbitration with supporting documentation and Plaintiffs' deposition testimony. Dkt. No. 46.

## II. Legal Standard

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., "enables the enforcement of a contract to arbitrate, but requires that a court shall be 'satisfied that the making of the agreement for arbitration . . . is not in issue' before it orders arbitration." Guidotti v. Legal Helpers Debt Resolution, LLC, 716 F.3d 764, 771 (3d Cir. 2013) (citing 9 U.S.C. § 4). Here, the Complaint and its supporting documents were unclear regarding the agreement to arbitrate, and the parties engaged in limited discovery, so the Court entertains the renewed motion under Federal Rule Civil Procedure 56's summary judgment standard. Id. at 776. Under that standard, the Court will grant summary judgment and order arbitration unless "the party opposing arbitration can demonstrate, by means of citations to the record," that there is "a genuine dispute as to the enforceability of the arbitration clause . . . ." Id. (quoting Somerset Consulting, LLC v. United Capital Lenders, LLC, 832 F. Supp. 2d 474, 482 (E.D. Pa. 2011)) (internal quotations omitted). In evaluating the motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Id. at 772 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). If summary judgment is denied, the Court may proceed summarily to a trial on the arbitrability issue. Id. at 776.

6

### III. Analysis

With its enactment of the FAA, Congress "expressed a strong federal policy in favor of resolving disputes through arbitration." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 522 (3d Cir. 2009). Even so, "[a]rbitration is strictly a matter of contract. If a party has not agreed to arbitrate, the courts have no authority to mandate that he do so." Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd., 181 F.3d 435, 444 (3d Cir. 1999). Thus, in deciding whether a party may be compelled to arbitrate under the FAA, the Court considers (1) whether there is an "express, unequivocal" agreement to arbitrate between the parties and, if so, (2) whether the dispute falls within the scope of that valid agreement. Flintkote Co. v. Aviva PLC, 769 F.3d 215, 219-20 (3d Cir. 2014) (internal citation omitted); Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980).

#### A. Agreement to Arbitrate

To determine whether the parties agreed to arbitrate, courts turn to the "ordinary state-law principals that govern the formation of contracts." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) (internal citations omitted). As the Court decided in its prior opinion, Pennsylvania law applies here based on the choice of law clause in the MDO Agreement. See Op. at 9; MDO Agreement § 6.04. Under Pennsylvania law, a valid contract exists where (1) "both parties manifested an intent to be bound by the agreement;" (2) "the terms of the agreement are sufficiently definite to be enforced;" and (3) "there was consideration." Century Indem. Co. v. Certain Underwriters at Lloyd's, London, 584 F.3d 513, 533 (3d Cir. 2009) (citing Blair v. Scott Specialty Gases, 283 F.3d 595, 603 (3d Cir. 2002)). The parties only dispute the first element: Intent.

Under Pennsylvania law, "when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." De Lage Landen Fin. Servs., Inc. v. Rasa Floors, LP, 792 F. Supp. 2d 812, 827 (E.D. Pa. 2011) (quoting Steuart v. McChesney, 498 Pa. 45, 444 A.2d 659, 661 (1982)). "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract," unless a party puts forth evidence capable of demonstrating a latent ambiguity. Bohler–Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 93 (3d Cir. 2001) (citing Krizovensky v. Krizovensky, 425 Pa. Super. 204, 624 A.2d 638, 642 (1993) and Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1013-14 (3d Cir.1980)). Failure to read a contract does not excuse a party from being bound by its terms. Schwartz v. Comcast Corp., 256 Fed. App'x. 515, 520 (3d Cir.2007) (citing Simeone v. Simeone, 525 Pa. 392, 581 A.2d 162, 165 (1990)).

Moreover, "the object of inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 582 (3d Cir. 2009) (citing Ingrassia Constr. Co., Inc. v. Walsh, 337 Pa. Super. 58, 486 A.2d 478, 483 (1984)). Accordingly, "a true and actual meeting of the minds is not necessary to form a contract," so long as there are outward and objective manifestations of assent. Id.

Here, the Court holds that Plaintiffs agreed to arbitrate. The decision is based on the express, unequivocal language of the MDO Agreement; extrinsic evidence that undermines Plaintiffs' claim of ambiguity in the MDO Agreement; and Plaintiffs' objective manifestations of intent to contract. The Court will address each in turn.

The express language of the MDO Agreement indicates that Plaintiffs agreed to arbitrate.[1] The parties do not dispute that the language of the arbitration clause is clear and unambiguous. Rather, the question is whether reasonable people reading the six-page MDO Agreement would believe that, by signing, they were agreeing to all the terms in the document including the arbitration clause. They would. Virtually every aspect of the Agreement suggests as much: The document is titled an agreement; its preamble specifically names Plaintiffs and Santander, and says that they agree to be bound "as follows" to the following six sections; the arbitration clause appears in section five on page four; it is partially bolded and conspicuously placed on the page; the entire document is a relatively short five pages; the final section, Section 6.03, which appears on the same page as signature line and the bold certification, states that the MDO Agreement contains all of the agreements and covenants between the parties; and there are signature lines for Santander's representatives and Plaintiffs at the end of the document. These parts indicate that the document contains a multi-clause agreement between two parties, and a party who places its signature at the bottom intends to be bound by every term.

The wording of the bold certification does not alter the conclusion. Plaintiffs suggest that, despite the parts just mentioned, the bold certification is the only clause that should be given force and effect. Because the certification appears above the signature line, they argue, "their signatures on the MDOAs were merely certifications that they received the commission plan" and nothing

---

[1] Plaintiffs raise a threshold argument about the scope of the Court's prior opinion. They contend that the Court found the MDO Agreement irredeemably ambiguous, so Santander cannot rely on the terms of the Agreement to make their renewed argument. See Opp'n Br. 14. Not so. The Court's decision was narrower. For that motion, Defendants argued only that Plaintiffs' signature indicated agreement to arbitrate. The Court rejected that argument as premature. It held that the preceding language clouded the meaning of the signature. Defendants now raise new points—namely, they explicate the contract as a whole and explain the signature's relationship to other terms in the contract. The Court did not address these points then because Defendants did not raise them. The Court may consider them in this renewed motion.

more. Opp'n. Br. at 15. That reading of the agreement is only possible if one ignores the rest of the document. But the intent of the parties is embodied in the "entirety of the written instrument," not from cherry-picked clauses. Moore v. Angie's List, Inc., 118 F. Supp. 3d 802, 818 (E.D. Pa. 2015) (citing Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 590-91, 777 A.2d 418, 429 (2001)); In re Alloy Mfg. Co. Emp. Trust, 411 Pa. 492, 496, 192 A.2d 394, 396 (1963) ("Stated another way, the intention of parties to a written instrument is to be garnered from a reading of the entire writing and not from detached portions, being necessary to consider every part thereof in order to resolve the meaning of a particular part as well as that of the whole."). When read as a whole, the MDO Agreement negates their interpretation. Indeed, as Santander notes, there would be no reason for a Santander representative to sign the document if the signature line shows merely that Plaintiffs received the Commission Plan.

Santander also directs the Court to Woods v. Vector Marketing Corp., No. 14-264, 2014 WL 4348285 (N.D. Cal. Aug. 28, 2014), a persuasive analogue to the instant case. In Wood, the court rejected the plaintiffs' argument that they were not bound to an arbitration clause in an employment agreement because the signature line was placed directly below two prominent IRS certifications. Id. at *3. They contended that "the signature line's placement suggests it was only to attest to the IRS certification, and not affirm the overall Sales Agreement [that had an arbitration clause]," but the court held that "an objective reading of the SRA reveals to a reasonable person that it encompasses the full two pages of terms, not just the IRS certification." Id. The same result applies here.

Accordingly, the MDO Agreement's terms are capable of one reasonable interpretation: a party who signs it intends to be bound by all of its clauses—including the arbitration clause—not just the certification.

To the extent the certification creates ambiguity, Santander has provided extrinsic evidence that confirms the existence of their agreement to arbitrate. First, there are the objective circumstances surrounding the signing of the MDO Agreement. Plaintiffs admit that they received the document, had an opportunity to review it before signing it, returned signed copies to Santander, and then commenced their employment. These objective manifestations showed their assent to the contract. They are not excused simply because they chose not to read it, harbored undisclosed disagreements about certain clauses, and subjectively believed (no matter how genuine) that they were not bound to the full agreement. See Am. Eagle Outfitters, 584 F.3d at 582; Schwartz, 256 Fed. App'x at 520.

Second, the additional documents reinforce the MDO Agreement's meaning. Plaintiffs received and signed the Offer Letter, which told them they had to "execute" the MDO Agreement "on or before your first day of work." By using the term "execute," the Offer Letter informed Plaintiffs that they were required "to make [the] legal document valid by signing" it. See Execute, BLACK'S LAW DICTIONARY (10th ed. 2014). And, in Donna's case, the addendum reinforced this confirmation by again informing her that she was bound to all of the MDO Agreement's terms. See Addendum at 1. These documents therefore put them on notice that, by signing the MDO Agreement, their signatures would bind them to the entire document, not just acknowledge receipt of the Commission Plan.

Plaintiffs argue that collateral documents like the Offer Letter cannot bind them to the arbitration agreement because they do not mention arbitrations. They cite Quiles v. Finance Exchange Co., 879 A.2d 281, 285 (Pa. Sup. Ct. 2005) in support. The Court disagrees. The collateral documents did not bind the parties to arbitrate. The express terms of the MDO Agreement did. The language in the other documents merely corroborate that point. Moreover,

11

Quiles does not stand for the cited proposition. In Quiles, the court refused to force an employee to arbitrate where she signed an agreement that mentioned the arbitration clause, but never received the actual agreement. See 879 A.2d at 286. Here, Plaintiffs admit that they received the MDO Agreement with the arbitration clause; they simply chose not to read it. Cf. id. ("This situation is distinguishable from those cases . . . where a party's failure to read a contract will not justify nullification or avoidance of the bargained for agreement."). The remaining cases cited by Plaintiffs on this point are distinguishable for the same reason. See Watson v. ScotlandYard Sec. Servs., Ltd., No. 12-1156, 2013 WL 5676771, at *2 (W.D. Pa. Oct. 18, 2013) ("Plaintiffs . . . cannot have entered into a valid contract with [defendant] if they had never actually received the employee manual that contained the arbitration policy."); Hudyka v. Sunoco, Inc., 474 F. Supp. 2d 712, 717 (E.D. Pa. 2007) (denying arbitration because, inter alia, defendant "has not shown that [plaintiff] received a copy of the booklet [containing the arbitration clause]").

In sum, the Court holds that Plaintiffs agreed to arbitrate based on the MDO Agreement's express terms and corroborative extrinsic evidence. Although Plaintiffs claim that they did not mean to be bound to the agreement, their claims (taken as true) do not create a dispute of material fact that could fend off summary judgment. Their outward, objective manifestations show assent to the unambiguous arbitration agreement. As such, they are bound to it.

### B. Scope of the Agreement

The Court next finds that Plaintiffs' claims fall within the scope of the arbitration agreement. Defendants briefed why the claims fall within the scope of the agreement and why the agreement precludes class arbitration. See Defs.' Br. at 25-26. Plaintiffs do not address these arguments. The Court construes their silence as acquiescence of those issues. See Griglak v. CTX Mortgage Co., LLC, No. 09-5247, 2010 WL 1424023, at *3 (D.N.J. Apr. 8, 2010) ("The failure to

respond to a substantive argument to dismiss a count, when a party otherwise files opposition, results in a waiver of that count."). Nonetheless, their FLSA and NJWHL overtime claims fall within the scope of the agreement because they "aris[e] under federal, state or local statute relating to employment . . . ." MDO Agreement § 5.04. And although the consequences of Plaintiffs' collective and class action waiver are severe, courts have upheld such waivers before. See Porreca v. Rose Grp., No. 13-1674, 2013 WL 6498392, at *13 (E.D. Pa. Dec. 11, 2013) (upholding waiver in FLSA case and collecting cases). The Court will do the same, particularly because Plaintiffs do not object to it.

### IV. Conclusion

For the reasons set forth herein, Defendants' renewed motion to compel arbitration, Dkt. No. 46, is **GRANTED**. An appropriate Order accompanies this Opinion.

Plaintiffs also filed a motion to strike certain affirmative defenses in Defendants' Answer. Dkt. No. 44. Because the Court holds that this case must be sent to arbitration, the motion to strike is **DENIED** as moot.

**Dated: January 25, 2017**

*/s Madeline Cox Arleo*_____
**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**